## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | CHAPTER 15 |
| GRANT FOREST PRODUCTS INC., *et al.*,[1] | |
| Debtors in Foreign Proceedings. | Case No. 10-11132<br>Joint Administration Pending |

**MEMORANDUM OF LAW IN SUPPORT OF MONITOR'S: (I) MOTION FOR ENTRY OF AN ORDER GRANTING RECOGNITION AND RELIEF IN AID OF FOREIGN MAIN PROCEEDING PURSUANT TO 11 U.S.C. §§ 1515, 1517 AND 1520; (II) MOTION FOR JOINT ADMINISTRATION; AND (III) MOTION FOR EX PARTE EMERGENCY RELIEF AND PROVISIONAL RELIEF PURSUANT TO 11 U.S.C. §§ 105(A), 1519 AND 1521**

Dated:  March 31, 2010
        Wilmington, Delaware

ELLIOTT GREENLEAF

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Andrew G. Mirisis (DE Bar No. 5365)
1105 North Market Street, Suite 1700
Wilmington, Delaware  19801
Telephone:  (302) 384-9400
Facsimile:  (302) 384-9399
Email:  rxza@elliottgreenleaf.com
Email:  sak@elliottgreenleaf.com
Email:  agm@elliottgreenleaf.com

-- and --

Jeffrey W. Kelley
Garrett A. Nail
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, NE
Suite 5200
Atlanta, GA  30308-2216
Telephone:  (404) 885-3000
Facsimile:  (404) 885-3900

---

[1] The proposed jointly administered cases are those of the following debtors: Grant Forest Products Inc., Grant Forest Products Sales Inc., Grant Alberta Inc., Grant U.S. Holdings GP, Southeast Properties LLC, Grant Clarendon LP, Grant Allendale LP, Grant US Sales Inc., Grant Newco LLC, and Grant Excluded GP.

Email: Jeffrey.Kelley@troutmansanders.com
Email: Garrett.Nail@troutmansanders.com

*Attorneys for Ernst & Young Inc., Monitor
and Foreign Representative of the Debtors*

## Table of Contents

PRELIMINARY STATEMENT .................................................................................4

FACTUAL BACKGROUND...................................................................................5
    Debtors' Corporate Structure.......................................................................6
    Debtors' Operations and Management ........................................................8
    Events Leading to the CCAA Proceeding .................................................10
    CCAA Proceeding .....................................................................................10
    Proposed Sale.............................................................................................11

ARGUMENT AND CITATION TO AUTHORITY ...............................................9

I.    THE COURT SHOULD RECOGNIZE THE CCAA PROCEEDING AS A FOREIGN MAIN PROCEEDING...............................................................13
    A.    The Petition Meets the Requirements of Section 1515 ...............14
    B.    A Foreign Representative Commenced These Cases....................15
    C.    The CCAA Proceeding Should be Recognized as a Foreign Main Proceeding.........15

II.    RECOGNIZING THE CCAA PROCEEDING IS NOT MANIFESTLY CONTRARY TO PUBLIC POLICY ...............................................................17

III.    THE INTERIM RELIEF REQUESTED BY THE MONITOR IS WITHIN THE SCOPE OF SECTION 1519 AND APPROPRIATE UNDER THE CIRCUMSTANCES..............18

CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.,*
  84 F.3d 1471 (3d Cir. 1996) (en banc) ................................................. 16

*Caddel v. Clairton Corp.,*
  105 B.R. 366 (N.D. Tex. 1989) ........................................................ 10

*Comfeld v. Investors Overseas Servs. Ltd.,*
  471 F. Supp. 1255 (S.D.N.Y. 1979), *aff'd,* 614 F.2d 1286 (2d Cir. 1979) .............. 10

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers,*
  415 U.S. 423 (1974) ................................................................. 17

*In re Banco Nacional de Obras v. Servicios Publico, S N C.,*
  91 B.R. 661 (Bankr. S.D.N.Y. 1988) .................................................. 15

*In re Basis Yield Alpha Fund (Master),*
  381 B.R. 37 ......................................................................... 12

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund,*
  374 B.R. 122 (Bankr. S.D.N.Y. 2007) ................................................. 12

*In re Bird,*
  222 B.R. 229 (Bankr. S.D.N.Y. 1998) ................................................. 15

*In re Chemokine Theraputics, Inc.,*
  No. 09-11189 (Bankr. D. Del. Apr. 6, 2009) ..................................... 15, 18

*In re Davis,*
  191 B.R. 577 (Bankr. S.D.N.Y. 1996) ................................................. 10

*In re Destinator Technologies,*
  No. 08-11003 (CSS) (Bankr. D. Del. May 20, 2008) .................................... 15

*In re Japan Airlines Corporation,*
  No 10-10190 (JMP) (Bankr. S.D.N.Y. Jan. 19, 2010) ................................... 17

*In re Singer,*
  205 B.R. 355 (S.D.N.Y. 2000) ........................................................ 15

*Mount Real Corp.,* No. 0641636 (Bankr. D. Minn. Sept. 6, 2006) ....................... 10

*MuscleTech Research & Dev.,* No. 06-10992 (Bankr. S.D.N.Y. Mar. 3, 2006) ............. 10

*Norshield Asset Mgmt.,* No. 06-40997 (Bankr. D. Minn. June 28, 2006) ........................................ 10

*Quebec, Inc.,* No. 06-07875 (Bankr. N.D. Ill. Aug. 8, 2006) ........................................ 10

*Smith v. Dominion Bridge Corp.,*
    1999 WL 111465 (E.D. Pa. March 2, 1999) ........................................ 10

*TKR Cable v. Cable City Corp.,*
    267 F.3d 196 (3d Cir. 2001) ........................................ 17

*U.S. v. Bell,*
    414 F.3d 474 (3d Cir 2005) ........................................ 16

## STATUTES

11 U.S.C. § 1501(a) ........................................ 17

11 U.S.C. § 1506 ........................................ 13

11 U.S.C. § 1516(c) ........................................ 12

11 U.S.C. § 1519(e) ........................................ 15

Ernst & Young Inc. ("**E&Y**"), in its capacity as monitor (the "**Monitor**") and foreign representative of the above-captioned Debtors, pursuant to a proceeding ("**CCAA Proceeding**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended ("**CCAA**"), before the Ontario Superior Court of Justice (Commercial List) ("**CCAA Court**"), respectfully submits this *Memorandum of Law in Support of (I) Monitor's Motion for Entry of an Order Granting Recognition and Relief in aid of Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520; (II) Monitor's Motion for Joint Administration; and (III) Monitor's Motion for Ex Parte Emergency Relief and Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 1519, and 1521*, pursuant to Local Rule 9013-1(b), and respectfully states as follows:

## PRELIMINARY STATEMENT

The Monitor seeks ancillary relief under Chapter 15 of the Bankruptcy Code as part of the Debtors' comprehensive cross-border reorganization. Debtors have reached an agreement to sell certain of their businesses, which have assets located in Canada and the United States, to Georgia-Pacific LLC and certain of its affiliates (collectively, "**Georgia-Pacific**"). The CCAA Court approved the Debtors' substantial efforts to market their businesses, and recently approved the proposed sale to Georgia Pacific. The purchase agreement contemplates a complicated, multi-step transaction, whereby Georgia-Pacific will obtain certain of the assets of certain of the Debtors located in Canada, and will obtain the controlling partnership interests of Debtors with assets in the United States.

These chapter 15 cases, along with the corresponding recognition of the CCAA Proceeding, are a required element by the purchase agreement. Indeed, each piece of the proposed transaction is mutually dependent, such that the Debtors and Georgia-Pacific intend – and require – that the closing of each transaction is a condition precedent to the closing of the remaining transactions. Moreover, recognition of the CCAA Proceeding will ensure

consummation of the transaction. As set forth below, the Debtors meet the requirements of section 1517 of the Bankruptcy Code. Accordingly, this Court should enter an Order recognizing the CCAA Proceeding as a foreign main proceeding, as that term is defined by chapter 15.

The Monitor has also filed the Monitor's *Motion for Ex Parte Emergency Relief and Provisional Relief Pursuant to U.S.C. §§ 105(A), 1519 and 1521* (the "**Motion for Interim Relief**") seeking additional relief (the "**Interim Relief**") consistent with the relief granted in the Initial Order of the CCAA Court entered on June 25, 2009 (the "**Initial Order**"), as supplemented by the Supplemental Initial Order entered by the CCAA Court on March 31, 2010 (the "**Supplemental Initial Order**" and together with the Initial Order, the "**CCAA Orders**"), including: (i) on an *ex parte* basis, an emergency order to show cause with a temporary restraining order (the "**Emergency Order**"), imposing a stay of proceedings and actions against the Debtors and their property to the extent provided in the CCAA Orders and making any provision of the type described in section 365(e) of the Bankruptcy Code unenforceable against the Debtors until such time as an order is entered disposing of the Chapter 15 Recognition Motion and (ii) after notice and a hearing (if unresolved objections exist), an order recognizing and enforcing the CCAA Orders on an interim basis making any provision of the type described in section 365(e) of the Bankruptcy Code unenforceable against the Debtors until such time as an order is entered disposing of the Chapter 15 Recognition Motion (the "**Provisional Motion**").

## FACTUAL BACKGROUND

The Monitor commenced the Debtors' chapter 15 cases pursuant to section 1504 of the Bankruptcy Code, by filing the Debtors' chapter 15 petitions accompanied by certifications, statements, lists, and documents required by section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure. The Monitor seeks recognition of, and

relief necessary to aid, the foreign main proceeding, as defined in sections 101(23) and 1502(4) of the Bankruptcy Code, which is currently pending before the CCAA Court.

**Debtors' Corporate Structure**

As set forth more fully in the *Declaration of Peter Lynch in Support of (I) Monitor's Motion for Entry of an Order Granting Recognition and Relief in Aid of Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 1515, 1517 and 1520; (II) Monitor's Motion for Joint Administration; and (III) Monitor's Motion for Ex Parte Emergency Relief and Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 1519 and 1521* (the "**Lynch Declaration**"), and the *Declaration of Alexander Morrison in Support of (I) Monitor's Motion for Entry of an Order Granting Recognition and Relief in Aid of Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 1515, 1517 and 1520; (II) Monitor's Motion for Joint Administration; and (III) Monitor's Motion for Ex Parte Emergency Relief and Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 1519 and 1521* (the "**Morrison Declaration**"), the Debtors are a leading manufacturer of oriented strand board ("**OSB**"). Debtors own four mills used to produce OSB and other wood products, two of which are located in Canada at Englehart, Ontario ("**Englehart Mill**") and Timmins, Ontario ("**Timmins Mill**"), and two of which are located in the United States at Allendale, South Carolina ("**Allendale Mill**") and Clarendon, South Carolina ("**Clarendon Mill**").[2] Grant Forest also owns 50% of a fifth OSB mill located at High Level, Alberta Canada ("**Alberta Mill**"). With a total capacity to produce 3.7 billion square feet of OSB per annum, the Debtors have the capacity to be the third largest OSB producer in North America.

Grant Forest Products Inc. ("**Grant Forest**") is a privately owned corporation, organized under Ontario laws, that serves as the Debtors' main operating company, owning among other

---

[2] The Clarendon Mill is a new mill with construction substantially complete; however, due to current market conditions, Debtors have not brought the Clarendon Mill online.

things the Englehart Mill and the Timmins Mill, 50% of the Alberta Mill,[3] remanufacturing and coated wood products facilities at Earlton, Ontario, various woodlots and other real estate, and a golf course. Grant Forest also holds the following subsidiary equity interests:

(a)  a 99.99% partnership interest in Grant U.S. Holdings GP ("**Grant Holdings**"), which is organized under Delaware law;

(b)  100% of the ownership interest in Grant Alberta Inc. ("**Alberta**"), a company organized under Alberta law that, in turn, holds the remaining .01% partnership interest in Grant Holdings as its only asset; and

(c)  100% of the ownership interest in Grant Forest Product Sales Inc. ("**Grant Sales**"), a company organized under Ontario law that sells the OSB produced from the Canadian mills.

Grant Holdings is a Delaware partnership, controlled and owned by Grant Forest and Alberta. Grant Holdings holds the membership interests of Southeast Properties LLC ("**Southeast**"), a Delaware limited liability company, and preferred limited partnership interests in Grant Allendale LP ("**Allendale LP**") and Grant Clarendon LP ("**Clarendon LP**"), both Delaware limited partnerships. Allendale LP and Clarendon LP own the Allendale Mill and Clarendon Mill, respectively. Southeast holds 100% of the membership interests in Grant Newco, LLC ("**Newco**"), a Delaware limited liability company. Southeast also holds limited partnership interests in Clarendon LP and Allendale LP. Finally, Southeast holds 100% of the ownership interest in a Delaware corporation, Grant US Sales Inc. ("**US Sales**"). US Sales is responsible for selling the materials produced at the Allendale Mill.

Newco holds the general partnership interests in Clarendon LP and Allendale LP. Thus, the ownership of Clarendon LP and Allendale LP is summarized as follows: Grant Holdings holds preferred limited partnership interests; Southeast holds limited partnership interests; and Newco is the general partner of each entity. Allendale LP and Clarendon LP are each general partners of a Delaware partnership, Grant Excluded GP ("**Excluded**", and together with US

---

[3] Title to the Alberta Mill is held by Footner Forest Products Ltd. and Grant Forest owns 50% of the shares of

Sales, Newco, Clarendon LP, Allendale LP, and Southeast, the "**Additional Applicants**", and with Grant Holdings, the "**U.S. Applicants**"). Each Additional Applicant holds a bank account in Ontario, Canada. The only other material assets of Excluded consist of unsecured obligations owing by other Additional Applicants to Excluded. An organizational chart is attached to the Lynch Affidavit as Exhibit A.

### Debtors' Operations and Management

The Debtors operate a fully integrated OSB manufacturing and sales business. Indeed, the OSB produced by the Allendale Mill and sold by US Sales is labeled in the same manner as the materials produced by the operating Canadian mill with a prominent Grant "G" logo and distinctive red edge seal or product coating.

Grant Forest, founded in 1980 by Peter Grant Sr., ultimately owns the equity interests in all of the Debtors. Grant Forest's head office is located in Toronto, Ontario ("**Canadian Headquarters**"). Grant Forest additionally maintains administrative offices in Earlton, Ontario, and an IT support office in Mississauga, Ontario. Through a series of holding companies, the ultimate shareholders of Grant Forest are Peter Grant Sr., and Twin Lakes Trust, a Grant family trust.

A number of the members of the boards of directors, boards of management, and officers are common among the Debtors, including Peter Lynch and Peter Grant Jr., who both reside in Canada. All of the directors of Grant Forest are Canadian. Resolutions by the boards of directors of the Debtors are historically passed by written resolution. Moreover, formal meetings by the boards of directors for the Additional Applicants have not regularly occurred in the United States for several years.

The principal financial records and books are maintained in the Canadian Headquarters.

---

Footner Forest Products Ltd.

The directing minds of the Debtors also are also located at the Canadian Headquarters. All major budgeting, financial, marketing, sales, and overall strategy decisions for the Debtors are made in or monitored from the Canadian Headquarters. In addition, all treasury, cash management, and banking arrangements for the Debtors are coordinated from the Canadian Headquarters. Finally, major human resources decisions, including compensation and benefits for all officers and senior management of the Debtors, are made from the Canadian Headquarters.

Grant Forest, Grant Sales, Alberta, and Grant Holdings are obligated as borrowers or guarantors under two collective levels of primary secured debt ("**First Lien Debt**" and "**Second Lien Debt**", respectively). The First Lien Debt holders ("**First Lien Lenders**") are represented by their agents, The Toronto-Dominion Bank and a related entity, Toronto-Dominion (Texas) LLC ("**First Lien Lenders' Agent**"). The Bank of New York Mellon ("**Second Lien Lenders' Agent**") now serves as the agent for the Second Lien Debt holders ("**Second Lien Lenders**").[4] The majority of the principal amount owing under the First Lien Debt is held by Canadian lenders. Moreover, a number of the Second Lien Lenders are also Canadian. Grant Forest and Grant Holdings are the primary borrowers under the First Lien Debt. Grant Holdings is the primary borrower under the Second Lien Debt. Grant Sales, Alberta, and the Additional Applicants (with the exception of Excluded) are guarantors of the First Lien Debt and the Second Lien Debt. Grant Forest is an additional guarantor of the Second Lien Debt.

---

[4] The Toronto-Dominion Bank and a related entity, Toronto-Dominion (Texas) LLC were originally the agents for the Second Lien Lenders but, before the commencement of the CCAA Proceeding, resigned that position and transferred their interests in respect thereto to The Bank of New York Mellon as the replacement agent for the Second Lien Lenders.

**Events Leading to the CCAA Proceeding**

The demand for OSB has decreased contemporaneously with the general decline in the construction industry and the building materials market. As a result of current conditions, the Debtors are currently operating only the Allendale Mill in the United States and the Englehart Mill in Canada. The Timmins Mill and Alberta Mill are idle. The Clarendon Mill is a new mill with construction substantially complete; however, due to current market conditions, Debtors have not brought the Clarendon Mill online.

The recent economic slump and high costs related to the Debtors' acquisition and construction of the Clarendon Mill and Allendale Mill have strained the Debtors' financial health. Indeed, the Debtors are in default of their obligations under the documents governing the First Lien Debt and the Second Lien Debt. As of May 2009, the First Lien Lenders were owed approximately $398 million in principal, plus interest, and the Second Lien Lenders were owed approximately $150 million in principal, plus interest.

**CCAA Proceeding**

Certain of the Debtors applied for protection under the CCAA. On June 25, 2009, by the Initial Order, the CCAA Court granted the requested relief and appointed E&Y as Monitor for Grant Forest, Alberta, Grant Holdings, and Grant Sales. Among other things, the Initial Order provided that the Debtors would engage an investment offering advisor ("**Investment Offering Advisor**") to commence a marketing process ("**Marketing Process**") to provide interested parties with the opportunity to offer to purchase the business and operations of certain of the Debtors. The Debtors selected E&Y to serve as the Investment Offering Advisor. Thereafter, E&Y undertook the role of the Investment Offering Advisor to assist and oversee the Marketing Process.

The First Lien Lenders' Agent applied to add the Additional Applicants as parties to the

CCAA Proceeding. On March 31, 2010, the CCAA Court granted the requested relief and entered the Supplemental Initial Order, which added the Additional Applicants in the CCAA Proceeding.

**Proposed Sale**

Pursuant to the Marketing Process, as approved by the CCAA Court, the Debtors engaged the Investment Offering Advisor to market the businesses of the Debtors. After extensive marketing efforts, the Debtors received several proposals to purchase the businesses of the Debtors (and / or parts thereof).

As set forth in more detail in the *Monitor's Motion Pursuant to Sections 363, 1501, 1507, 1520, 1521, and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, and 6004 for an Order (a) Affirming and Enforcing the Order of the CCAA Court Approving the Sale of Certain Assets and Such Other Related Relief and (b) Separately, (i) Authorizing and Approving the Sale of Assets and (ii) Granting Other Related and Further Relief,* filed contemporaneously herewith, Debtors have accepted an offer by Georgia-Pacific to purchase certain of the Debtors' businesses ("**Proposed Sale**"). The proposed transaction is memorialized in an agreement dated January 8, 2010. Georgia-Pacific will purchase certain of the assets of Grant Forest, Alberta, and Grant Sales,[5] and will engage in a transaction that ultimately results in Georgia-Pacific owning all of the partnership interests in Grant Holdings and, thus, the equity in the Additional Applicants. By acquiring the partnership interests in Grant Holdings, Georgia-Pacific intends for the business of the Additional Applicants to continue as usual, with as little disruption as possible. With the exception of the liens and claims of the First Lien Lenders' Agent, the First Lien Lenders, the Second Lien Lenders' Agent, the Second Lien Lenders, and certain claims owing to affiliates of Grant Forest, the claims of the other creditors of the U.S. Applicants, other than claims owing by

Grant Holdings,[6] will not be compromised, reduced or adversely affected simply as a result of the Proposed Sale. On March 30, 2010, the CCAA issues its Reasons for Decisions approving the Proposed Sale ("**Reasons for Decisions**"). On March 31, 2010, the CCAA Court granted an order approving the proposed transaction (the "**Canadian Sale Approval Order**").

## ARGUMENT AND CITATION TO AUTHORITY

Chapter 15 of the Bankruptcy Code, enacted in 2005, provides effective mechanisms for dealing with cases of cross-border insolvency. Indeed, the provisions of chapter 15 authorize a bankruptcy court to recognize a debtor's foreign reorganization plan and, while reorganization efforts are pending, authorize a bankruptcy court to prevent creditors from derailing those efforts in the Unites States.

The Monitor commenced these chapter 15 cases to obtain recognition of the CCAA Proceeding. Specifically, the Monitor is seeking recognition and enforcement of the Reasons for Decisions and the Canadian Sale Approval Order, wherein the CCAA Court: (i) agreed that the Marketing Process included a structured, fair, wide and effective canvassing of the market;[7] (ii) found that "numerous parties participated over a number of months in a complex process designed to achieve not only maximum value of the assets of the businesses, but to ensure tis survival as a going concern for the benefit of many stakeholders;[8] (iii) found that the Proposed Sale and relief requested in connection with the Proposed Sale were inextricably linked to the restructuring of the Debtors and, as such, were properly before the CCAA Court and appropriate

---

[5] Georgia-Pacific will not acquire certain excluded assets, including, without limitation, the Timmins Mill, the shares of Footner Forest Products Ltd, the Non-Core Assets (as defined in the Agreement), cash on closing, income tax refunds, and certain other assets as described more fully in the Agreement.

[6] Pursuant to the Canadian Order, all liens, claims and encumbrances against Grant Holdings' partnership interests, which are being purchased by Georgia-Pacific, were released, discharged and expunged. Upon information and belief, the Monitor and the Debtors believe that the only creditors of Grant Holdings were the First Lien Lenders' Agent, the First Lien Lenders, the Second Lien Lenders' Agent, the Second Lien Lenders, and certain affiliates of Grant Forest.

[7] Reasons for Decisions ¶ 21.

[8] Reasons for Decisions ¶ 32.

for consideration by the CCAA Court;[9] (iv) found that the First Lien Lenders are entitled to (a) add the Additional Applicants to the CCAA Proceeding, (b) release their liens, and (c) automatically and simultaneously cause the release of the Second Lien Lenders' security;[10] and (v) approved the Proposed Sale.[11]

Recognition is important to ensure that the Proposed Sale is consummated, and the provisions contained therein are given effect under domestic laws. Moreover, the Debtors' Chapter 15 petitions meet the standard for granting relief under the Bankruptcy Code. There is no question that E&Y, as the Monitor, is a "foreign representative" as that term is used in section 1517 of the Bankruptcy Code, that the Debtors' center of main interest lies in Canada, that the CCAA Proceeding is a foreign proceeding, and that the Chapter 15 Petitions otherwise meet the objective criteria for recognition. Put simply, recognition of the CCAA Proceeding affords the opportunity to effectively reorganize across international borders, thereby maximizing the value of the enterprise for the benefit of stakeholders in multiple jurisdictions.

## I. THE COURT SHOULD RECOGNIZE THE CCAA PROCEEDING AS A FOREIGN MAIN PROCEEDING

Section 1517(a) of the Bankruptcy Code *requires* recognition of a foreign proceeding when the following conditions are satisfied:

(1)     such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2)     the foreign representative applying for recognition is a person or body; and

(3)     the petition meets the requirements of section 1515.

---

[9] Reasons for Decisions ¶ 58.
[10] Reasons for Decisions ¶ 59.
[11] *See* CCAA Sale Order.

The Debtors satisfy all of section 1517(a)'s requirements. Moreover, the CCAA Proceeding is a "foreign main proceeding" as that term is defined by section 1517(b). Accordingly, the CCAA Proceeding should be recognized as a foreign main proceeding.

A.    The Petition Meets the Requirements of Section 1515

Section 1515 authorizes a foreign representative to make an application for recognition, provided that the application is accompanied by: (i) a certified order commencing the foreign proceeding and appointing the foreign representative; and (ii) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(i).    The CCAA Proceeding Is A Foreign Proceeding

Bankruptcy Code section 101(23) provides, in pertinent part:

> the term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of restructuring or liquidation.

Courts routinely recognize CCAA proceedings as foreign proceedings under Chapter 15. *See, e.g.*, *Nortel Networks Corp.*, Case No. 09-10164 (Bankr. D. Del. Feb. 27, 2009); *Pope & Talbot, Inc.*, Case No 08-11933 (Bankr D. Del. Sept. 8, 2008); *Destinator Technologies Inc.*, Case No. 08-11003 (Bankr. D. Del. June 6, 2008); *Mount Real Corp.*, No. 0641636 (Bankr. D. Minn. Sept. 6, 2006); *Quebec, Inc.*, No. 06-07875 (Bankr. N.D. Ill. Aug. 8, 2006); *Norshield Asset Mgmt.*, No. 06-40997 (Bankr. D. Minn. June 28, 2006); *MuscleTech Research & Dev.*, No. 06-10992 (Bankr. S.D.N.Y. Mar. 3, 2006). Further, under former section 304 of the Bankruptcy Code, the statutory predecessor to chapter 15, CCAA proceedings, including insolvency proceedings, were regularly granted comity. *See Smith v. Dominion Bridge Corp.*, 1999 WL 111465, at *3 (E.D. Pa. March 2, 1999) ("As a sister common law jurisdiction, courts have consistently extended comity to Canadian Bankruptcy proceedings."); *In re Davis*, 191 B.R. 577, 587 (Bankr.

S.D.N.Y. 1996) ("Courts in the United States uniformly grant comity to Canadian proceedings");

*Comfeld v. Investors Overseas Servs. Ltd.,* 471 F. Supp. 1255, 1260-62 (S.D.N.Y. 1979), *aff'd,*

614 F.2d 1286 (2d Cir. 1979); *Caddel v. Clairton Corp.,* 105 B.R. 366, 366 (N.D. Tex. 1989).

> (ii). The Application for Recognition Is Accompanied By All Required Documents

Certified Copies of the Initial Order and Supplemental Initial Order are attached to the

Morrison Declaration, filed contemporaneously herewith, as Exhibits A and B, respectively.

Moreover, the Morrison Declaration identifies all foreign proceedings with respect to the

Debtors that are known by the Monitor. Accordingly, the requirements of section 1517(a)(3)

are satisfied.

> B. A Foreign Representative Commenced These Cases

Similarly, the face of the Initial Order and the Supplemental Initial Order indicate that

the Monitor "is authorized to apply . . . for recognition of these proceedings as foreign

proceedings in the United States pursuant to Chapter 15 of the Unites States Bankruptcy

Code." (Initial Order, ¶ 54, Supplemental Initial Order, ¶ 37.) The term "foreign

representative" is defined by 101(24) of the Bankruptcy Code as a "person or body . . . authorized

in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or

affairs or to act as a representative of such foreign proceeding." Under section 1516(b) of the

Bankruptcy Code, this Court is entitled to presume that the Initial Order and the Supplemental

Initial Order are authentic, and under section 1516(a), this Court is entitled to presume that E&Y

is a foreign representative. Thus, E&Y, as Monitor, qualifies as a foreign representative, thereby

satisfying the requirements of section 1517(b).

> C. The CCAA Proceeding Should be Recognized as a Foreign Main Proceeding

The CCAA Proceeding is a foreign main proceeding, as that term is defined by section

1517(b)(1) of the Bankruptcy Code. That section defines "foreign main proceeding" as a

proceeding "pending in the country where the debtor has the center of its main interests."
11 U.S.C. § 1517(b)(1).

The Bankruptcy Code does not define "center of main interests" or "COMI." The Bankruptcy Code does provide, however, that, in the absence of evidence to the contrary, the debtors' registered offices are presumed to be the COMI. 11 U.S.C. § 1516(c). Moreover, Courts have developed a list of factors to consider in making a COMI determination, including: (a) the location of the debtor's headquarters; (b) the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); (c) the location of the debtor's primary assets; (d) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and (e) the jurisdiction whose law would apply to most disputes. *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007); *In re SPhinX; Ltd*, 351 B.R 103, 117 (Bankr. S.D.N.Y. 2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007).

Here, under the relevant criteria, Canada serves as the Debtors' COMI. As set forth in the Peter Lynch Affidavit:

(a)     Grant Forest, the ultimate equity holder of all of the Debtors, is incorporated under Canadian laws, has its headquarters located in Canada, maintains additional offices in Canada, and itself is owned in whole by persons or entities residing in Canada.

(b)     Likewise, Alberta, the other entity with a partnership interest in Grant Holdings, is located in Canada.

(c)     A number of the members of the boards of directors, boards of management, and officers are common among the Debtors, including Peter Lynch and Peter Grant Jr., both of whom reside in Canada.

(d)     All of the directors of Grant Forest, the ultimate parent company, are Canadian.

(e)     The principal records and books of the Debtors are maintained in Canada.

(f) The directing minds of the Debtors are located in Canada, and all major budgeting, financial, marketing, sales, and overall strategy decisions for the Debtors are made in Canada. Similarly, a treasury, cash management, and banking arrangements of the Debtors are coordinated from Canada. Finally, major human resources decisions are made from Canada.

(g) The majority of the principal amount owing under the First Lien Debt is held by Canadian lenders, and a number of the Second Lien Lenders are Canadian.

(h) The products made in the United States are branded with "Grant Forest Products" insignia, the same branding established by Grant Forest for its Canadian products.

(i) Grant Forest and Grant Holdings are borrowers of the First Lien Debt, Grant Holdings is the borrower of the Second Lien Debt, and all of the other Debtors except Grant Excluded GP are guarantors of the First Lien Debt and the Second Lien Debt.

(j) The majority of Debtors' contracts, including the documents for the First Lien Debt and the Second Lien Debt were negotiated in Canada. The First Lien Debt documents provide that Canadian law applies.[12]

In short, Canada is the center of the Debtors' main interests. Accordingly, the CCAA Proceeding is pending in the center of the Debtors' main interests and constitutes a "foreign main proceeding" as defined in section 1517(a)(1) of the Bankruptcy Code.

## II. RECOGNIZING THE CCAA PROCEEDING IS NOT MANIFESTLY CONTRARY TO PUBLIC POLICY

In addition, recognizing the CCAA Proceeding would not be manifestly contrary to the public policy of the United States under 11 U.S.C. § 1506,[13] which authorizes a court to refuse recognition of a foreign proceeding where inconsistent with United States' public policy. Indeed, granting such recognition effects United States public policy regarding foreign proceedings as articulated, among other ways, through the objectives in sections 1501(a) and 1508 of the Bankruptcy Code, which affirm the international origin of chapter 15 and provide

---

[12] In the Reasons for Decisions and the CCAA Sale Approval Order, the CCAA Court found that the Debtors' COMI was Canada.

[13] As the legislative history explains, "11 U.S.C. § 1506 follows of the [UNCITRAL] Model Law [on Cross-Border Insolvency (1997)] article 5 exactly, [which] is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world. The word 'manifestly' in international usage restricts the, public policy exception to the most fundamental policies of the United States." HR. Rep. 109-31(1), 109 Cong., 1st Sess. 2005, *reprinted in 2005* U.S.C.C.A.N. 88, 169 at 172.

effective mechanisms for dealing with cases of cross-border insolvency, including: (i) establishing cooperation between U.S. courts, trustees, examiners, debtors and debtors-in-possession, and the courts and other competent authorities of foreign countries; (ii) creating greater legal certainty for trade and investment; (iii) establishing fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested parties, including the foreign debtors; (iv) protecting and maximizing the value of the foreign debtors' assets; and (v) facilitating the rescue of the foreign debtors' financially-troubled businesses (thereby protecting investments in the foreign debtors and preserving the employment of the foreign debtors' employees). 11 U.S.C. §§ 1501(a), 1508.

### III. THE INTERIM RELIEF REQUESTED BY THE MONITOR IS WITHIN THE SCOPE OF SECTION 1519 AND APPROPRIATE UNDER THE CIRCUMSTANCES

The Interim Relief Motion seeks Interim Relief consisting of the entry of two orders prior to recognition to avoid irreparable harm: (i) on an *ex parte* basis, the Emergency Order, and (ii) after notice and a hearing (if unresolved objections exist), the Provisional Order.

Ultimately, upon recognition of the CCAA Proceeding as a foreign main proceeding, the Monitor will have the benefit of the relief conferred by section 1520 of the Bankruptcy Code, including the automatic stay under section 362 and the authority to dispose of assets in the United States under section 363, each of which will apply as a matter of right with respect to the Monitor and the property of the Debtors in the United States pursuant to sections 1520(a)(1) and (2). However, pursuant to Rule 2002(q), an order granting recognition cannot be granted until at least 21 days of notice have been given. In the interim, the Monitor requires immediate, provisional relief to (i) protect against the commencement of potential actions against the Debtors and their property and (ii) protect against the enforcement of *ipso facto* clauses in

executory contracts and leases of the type described in section 365(e) of the Bankruptcy Code, each in order to continue operating without interruption and preserve value, including by protecting the Proposed Sale from jeopardy.

Sections 1519(a)(1) and (a)(3) authorize the Court to grant the Interim Relief pursuant to section 1521(a)(7), which provides for any relief available to a trustee in a chapter 11 case, subject to certain exceptions not relevant here. Section 105(a) of the Bankruptcy Code further allows the court to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code, again, subject to certain exceptions not relevant here. The Interim Relief sought by the Monitor is within the broad power of this Court as clearly contemplated in sections 1519, 1521 and 105(a) of the Bankruptcy Code and fully consistent with the relief granted in past cases in which bankruptcy courts, including this Court, have recognized, enforced and cooperated with foreign proceedings under chapter 15 of the Bankruptcy Code. *See, e.g., W.G. Wood Corporation Ltd.*, No 09-11893 (KG) (Bankr. D. Del. June 10, 2009); *In re Chemokine Theraputics, Inc.*, No. 09-11189 (Bankr. D. Del. Apr. 6, 2009); *In re Destinator Technologies*, No. 08-11003 (CSS) (Bankr. D. Del. May 20, 2008).

By the Interim Relief Motion, and in compliance with the instructions of the CCAA Court, the Monitor has asked this Court, among other things, to immediately stay the commencement of actions against the Debtors and their property. The Interim Relief sought is wholly consistent with and in furtherance of the injunctive relief that has been granted in the CCAA Proceeding. *See In re Singer*, 205 B.R. 355 (S.D.N.Y. 2000) (applying a foreign stay injunction without notice under former section 304(b) of the Bankruptcy Code). The Interim Relief is necessary, among other things, "to prevent individual American creditors from arrogating to themselves property belonging to the creditors as a group." *In re Banco Nacional*

*de Obras v. Servicios Publico, S N C.*, 91 B.R. 661, 664 (Bankr. S.D.N.Y. 1988); *see also In re Bird*, 222 B.R. 229, 233 (Bankr. S.D.N.Y. 1998).

The relief available under section 1519 is available pursuant to "the standards, procedures, and limitations applicable to an injunction." 11 U.S.C. § 1519(e). In the Third Circuit, the "standard for evaluating a motion for preliminary injunction is a four-part inquiry as to: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *U.S. v. Bell*, 414 F.3d 474, 478 n. 4 (3d Cir 2005) (citing *ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir. 1996) (en banc)). The latter two factors should be taken into account only when they are relevant. *E.g.*, *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197-98 (3d Cir. 1990).

Based on the facts presented in these chapter 15 cases, it is highly likely that the Chapter 15 petitions will be granted and the CCAA Proceeding recognized as a foreign main proceeding with respect to the Debtors. Accordingly, upon such recognition, the Interim Relief requested herein will automatically apply to each of the Debtors, by operation of sections 1520 and 1521 of the Bankruptcy Code. Such relief is not repugnant to United States public policy; to the contrary, it is consistent with public policy and relief granted in previous similar cases.

Granting the relief is in the public interest. The purpose of chapter 15 is:

> [T]o incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
>
> (1) cooperation between—
>
> (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

(B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a). Entry of the Emergency Order and Provisional Order will permit the Monitor to administer the CCAA Proceeding without disruption.

As more fully discussed in the Interim Relief Motion, the Debtors face irreparable harm in the absence of the Interim Relief. *Ex parte* relief, pending provisional relief upon notice and a hearing (if unresolved objections exist), is appropriate when, as with the Debtors, the applicants are in need of immediate relief. The relief sought *ex parte* in the Emergency Order is more limited – seeking only to preserve the status quo by means of a stay and 365(e) relief for ten days – than the relief sought by the Provisional Order, which seeks interim enforcement of the CCAA Orders and section 365(e) relief pending disposition of the chapter 15 petitions. This limiting of the *ex parte* relief to preserving the status quo is consistent with United States public policy, which is to limit temporary restraining orders to "preserving the status quo for so long as is necessary to hold a hearing." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 439 (1974). Rule 65(b) of the Federal Rules of Civil Procedure, made applicable in these cases by Rule 7065 of the Federal Rules of Bankruptcy Procedure, requires that to obtain an *ex parte* temporary restraining order, the applicant must show that "immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." *See, e.g.*, *TKR Cable v. Cable City*

*Corp.*, 267 F.3d 196, 198 (3d Cir. 2001). Such temporary restraining orders have recently been issued by this Court in order to provide relief similar in all material respects to the Interim Relief sought in chapter 15 cases, and are becoming a routine feature of chapter 15 practice in this and other districts. *See, e.g., In re Japan Airlines Corporation*, No 10-10190 (JMP) (Bankr. S.D.N.Y. Jan. 19, 2010); *W.G. Wood Corporation Ltd.*, No 09-11893 (KG) (Bankr. D. Del. June 10, 2009); *In re Chemokine Theraputics, Inc.*, No. 09-11189 (Bankr. D. Del. Apr. 6, 2009).

In contrast to the potentially irreparable hardships described in the Interim Relief Motion that the Debtors would face in the absence of Interim Relief, the Interim relief will not significantly prejudice the Debtors' creditors or any other party in interest. To the contrary, the Interim Relief will benefit the Debtors' creditors by supporting the Monitor's efforts to preserve and maximize the Debtors' estate for the benefit of all creditors by achieving a global and equitable resolution of claims against the Debtors. Without the interim relief, equitable and orderly distribution of assets pursuant to the CCAA Orders would be jeopardized. Thus, the balance of the hardships tips decidedly in favor of granting the Interim Relief.

Finally, the CCAA Court authorized the Monitor to seek such Interim Relief in this Court (*See* Initial Order at ¶ 54, 56; Supplemental Initial Order at ¶ 37, 39.) The CCAA Court has also requested the U.S. Bankruptcy Court to make such orders and to provide such assistance to the Monitor as is necessary or desirable to recognize and give effect to the Debtors' CCAA Orders and the Proposed Sale (*see* Initial Order at ¶ 55; Supplemental Initial Order at ¶ 38; Reasons for Decisions ¶ 80; *see also* Canadian Sale Approval Order.)[14] Under section 1525(a), "consistent with section 1501, this court shall cooperate to the maximum extent possible with a foreign court

---

[14] While the CCAA Court recognized in the Reasons for Decisions that "if there is a valid objection by the [Second Lien Lenders,] it is appropriately made in the U.S. Bankruptcy Court at a hearing to recognize this Order" as recognized by the Bankruptcy Court for the Southern District of New York in *In re Metcalf & Mansfield Alternative Investments*, 421 B.R. 685, 699 (Bankr. S.D.N.Y., 2010), if the issue has been contested and fully litigated in a Canadian Court, "principles for recognition of foreign judgments strongly support the exercise of this Court's discretion to give *res judicata* effect to the Canadian Order." *Id.*

or a foreign representative." The Interim Relief is necessary to give effect to the CCAA Orders, both because the Debtors have assets located beyond the territorial reach of the CCAA Court. The CCAA Court specifically requested this Court's assistance. Thus, in addition to the reasons set forth above, the Interim Relief is justified pursuant to sections 1519 and 1521 of the Bankruptcy Code, the stated purposes of chapter 15, and under well-established principles of international comity.

*(remainder of page left intentionally blank)*

## CONCLUSION

**WHEREFORE,** for the reasons stated herein, the Monitor respectfully requests entry of orders granting relief requested herein and such other relief as is just under the circumstances.

Dated:    March 31, 2010
         Wilmington, Delaware

**ELLIOTT GREENLEAF**

_____
Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Andrew G. Mirisis (DE Bar No. 5365)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com
Email: agm@elliottgreenleaf.com

-- and --

Jeffrey W. Kelley
Garrett A. Nail
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900
Email: Jeffrey.Kelley@troutmansanders.com
Email: Garrett.Nail@troutmansanders.com

*Attorneys for Ernst & Young Inc., Monitor
and Foreign Representative of the Debtors*