## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

GRANT FOREST PRODUCTS INC., *et al.*,[1]

Debtors in Foreign Proceedings.

CHAPTER 15

Case No. 10-11132
Joint Administration Pending

## MONITOR'S MOTION PURSUANT TO SECTIONS 363, 1501, 1507, 1520, 1521, AND 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002 AND 6004 FOR AN ORDER (A) AFFIRMING AND ENFORCING THE ORDER OF THE CANADIAN COURT APPROVING THE SALE OF CERTAIN ASSETS AND SUCH OTHER RELATED RELIEF, AND (B) SEPARATELY, (i) AUTHORIZING AND APPROVING THE SALE OF ASSETS AND (ii) GRANTING OTHER RELATED AND FURTHER RELIEF

Ernst & Young Inc. ("**E&Y**"), in its capacity as court-appointed monitor (the "**Monitor**") and authorized foreign representative of Grant Forest Products Inc., Grant Forest Products Sales Inc., Grant Alberta Inc., Grant U.S. Holdings GP, Southeast Properties LLC, Grant Clarendon LP, Grant Allendale LP, Grant US Sales Inc., Grant Newco LLC, and Grant Excluded GP (collectively, the "**Debtors**"), pursuant to Sections 363, 1501, 1507, 1520, 1521, and 105(a) of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), hereby moves this Court for an order (A) Affirming and Enforcing the Approval and Vesting Order (the "**Canadian Sale Approval Order**") of the Ontario Superior Court of Justice (Commercial List) (the "**CCAA Court**") Approving the Vendors' Sale of Certain Assets Free and Clear of Liens, Claims and Encumbrances and Other Related and Further Relief, and (B) Separately Authorizing and Approving the Vendors' Sale and Transfer of Assets Free and Clear of Certain Liens, Claims and Encumbrances and Such Other Related

---

[1] The proposed jointly administered cases are those of the following debtors: Grant Forest Products Inc., Grant Forest Products Sales Inc., Grant Alberta Inc., Grant U.S. Holdings GP, Southeast Properties LLC, Grant Clarendon LP, Grant Allendale LP, Grant US Sales Inc., Grant Newco LLC, and Grant Excluded GP.

and Further Relief. In support of the Motion, the Monitor relies on the *Declaration of Alexander Morrison in Support of Monitor's Motion Pursuant to Sections 363, 1501, 1507, 1520, 1521, and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002, and 6004 for an Order (a) Affirming and Enforcing the Order of the Canadian Court Approving the Sale of Certain Assets and Such Other Related Relief and (b) Separately, (i) Authorizing and Approving the Sale of Assets and (ii) Granting Other Related and Further Relief* (the "**Morrison Declaration in Support of Sale Motion**"), filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION

1.      The Court has jurisdiction over these matters pursuant to 28 U.S.C. §§ 157 and 1334. These matters are core proceedings within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. § 1410.

2.      The statutory bases for relief requested herein are section 105, 363, 1520, 1521, and 1525 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure, and Local Rule 6004-1.

## BACKGROUND

3.      As set out in the Morrison Declaration in Support of Sale Motion, filed contemporaneously herewith and incorporated by reference, the Debtors are parties in a proceeding (the "**CCAA Proceeding**") pursuant to Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended ("**CCAA**"), before the CCAA Court. Pursuant to an order of the CCAA Court dated June 25, 2009 (the "**Initial Order**"), E&Y was appointed as Monitor for certain of the Debtors in the CCAA Proceeding. A certified true and correct copy of the Initial Order is attached as Exhibit A to the *Morrison Declaration in Support of (I) Monitor's Motion for Entry of an Order Granting Recognition and Relief in Aid of Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 1515, 1517, and 1520; (II)*

*Monitor's Motion for Joint Administration*; and (III) *Monitor's Motion for Ex Parte Emergency Relief and Provisional Relief Pursuant to 11 U.S.C. §§ 105(a), 1519 and 1521* ("**Morrison Declaration**").

4.    Among other things, the Initial Order provides that the Debtors will engage an investment offering advisor (the "**Investment Offering Advisor**") to commence a marketing process (the "**Marketing Process**") to provide interested parties with the opportunity to offer to purchase the business and operations of the Debtors.

5.    The Debtors appointed E&Y to serve as the Investment Offering Advisor. Thereafter, E&Y undertook the role of the Investment Offering Adviser to assist and oversee the Marketing Process.

### Debtor's Debt Structure

6.    Grant Forest Products Inc. ("**Grant Forest**"), Grant Forest Products Sales Inc. ("**Grant Sales**"), Grant Alberta Inc. ("**Alberta**"), and Grant U.S. Holdings GP ("**Grant Holdings**" and, collectively, the "**Initial Applicants**") are obligated as borrowers or guarantors under two collective levels of primary secured debt ("**First Lien Debt**" and "**Second Lien Debt**" and, collectively, the "**Credit Facilities**"). The holders of the First Lien Debt ("**First Lien Lenders**") are represented by their agents, The Toronto-Dominion Bank and a related entity, Toronto-Dominion (Texas) LLC ("**First Lien Lenders' Agent**"). The Bank of New York Mellon ("**Second Lien Lenders' Agent**") now serves as the agent for the Second Lien Debt holders ("**Second Lien Lenders**").[2]

7.    Grant Forest and Grant Holdings are the primary borrowers under the First Lien Debt. Alberta and Grant Sales serve as guarantors of the First Lien Debt. Likewise, Southeast Properties LLC ("**Southeast**"), Grant Clarendon LP ("**Clarendon LP**"), Grant

---

[2] Toronto-Dominion Bank and a related entity, Toronto-Dominion (Texas) LLC, were originally the agents for the Second Lien Lenders but, before the commencement of the CCAA Proceeding, resigned that position and transferred their interests in respect thereto to The Bank of New York Mellon as the replacement agent for the Second Lien Lenders.

Allendale LP ("**Allendale LP**"), Grant US Sales Inc. ("**US Sales**"), and Grant Newco LLC ("**Newco**," and collectively, "**US Entities**" and with the Initial Applicants, the "**Obligors**") serve as guarantors of the First Lien Debt. The First Lien Lenders' Agent, to secure the obligations under the First Lien Debt, holds various security interests granted by the Obligors over each of their respective property and assets.

8.      Grant Holdings is the primary borrower under the Second Lien Debt. Alberta, Grant Sales, Grant Forest, and the US Entities are guarantors of the Second Lien Debt. The Second Lien Lenders' Agent, to secure the obligations under the Second Lien Debt, holds various security interests granted by the Obligors over each of their respective property and assets.

9.      As of May 31, 2009, the Obligors owed approximately $398 million in principal, plus interest, under the First Lien Debt ("**First Lien Lenders' Liability**") and approximately $150 million in principal, plus interest, under the Second Lien Debt ("**Second Lien Lenders' Liability**"). Further, the Obligors are in default of their obligations under the Credit Facilities.

10.      The First Lien Lenders' Agent and the Second Lien Lenders' Agent are parties to an agreement dated March 21, 2007 (the "**Intercreditor Agreement**"). A copy of the Intercreditor Agreement is attached as Exhibit A to the Morrison Declaration in Support of Sale Motion. Grant Forest, Grant Holdings, Alberta, Grant Sales, and the US Entities are parties to and have agreed to be bound by the Intercreditor Agreement.

11.      The Intercreditor Agreement gives the First Lien Lenders' Agent wide discretion to enforce or release the First Lien Lenders' security interests over the assets securing repayment of the First Lien Debt. Indeed, until the First Lien Debt is satisfied, the First Lien Lenders' Agent has sole discretion to enforce rights with respect to the secured collateral, without having to seek consent of the Second Lien Lenders' Agent.

12.     At its core, the Intercreditor Agreement authorizes the First Lien Lenders' Agent to act as attorney-in-fact for the Second Lien Lenders' Agent. Specifically, the Intercreditor Agreement provides that the First Lien Lenders' Agent may elect to release the security interests related to the First Lien Debt and, thereafter, any charges by the Second Lien Lenders or their agents against the assets of the Obligors are automatically and unconditionally released. In addition, pursuant to the Intercreditor Agreement, the First Lien Lenders' Agent is authorized to take actions and execute as necessary any documents in connection with the release of the Second Lien Lenders' Agent's security interests.

### Marketing Process

13.     After its appointment as Investment Offering Advisor, E&Y commenced the Marketing Process as contemplated in the Initial Order. As additionally contemplated in the Initial Order, the Debtors appointed a Chief Restructuring Advisor ("**CRA**"), Stonecrest Capital Inc., to assist with their restructuring efforts. The Investment Offering Advisor coordinated with the Debtors, the independent directors of Grant Forest, management, the Monitor, the CRA and the First Lien Lenders' Agent in its efforts to find purchasers for or otherwise restructure the Debtors' businesses and operations.

14.     During the Marketing Process, an informal committee of Grant Forest's independent directors ("**Independent Directors**") – which excludes members of the founding Grant family, and the primary non-Grant family member of management, Peter Lynch ("**Excluded Parties**") – provided consultation. In fact, management and the Excluded Parties did not receive any information as to the content of bids by prospective purchasers for the Debtors' businesses and assets, nor were the Excluded Stakeholders involved in the evaluation of the bids at each stage of the Marketing Process.

15.     The Initial Order set forth the Marketing Process, which contemplated three phases. Briefly, (i) *Phase I* consisted of the identification by the Investment Offering

Advisor, the Debtors, and the CRA of potential bidders and the submission of expressions of interest; (ii) during *Phase II*, the selected bidders were invited to tour certain of the Debtors' facilities, conduct due diligence, and present purchase proposals; (iii) during *Phase IIb*, selected bidders were invited to conduct further due diligence and submit revised proposals; and (iv) during *Phase III*, the Debtors were required to conduct final negotiations, enter into contracts, and seek approval by the CCAA Court.

### Phase I

16.     During Phase I, the Investment Offering Advisor, in coordination with the CRA and the Debtors, prepared an overview of the Debtors' businesses and operations and a non-disclosure agreement to be executed by interested parties desiring to participate in the Marketing Process.

17.     In addition, an electronic data room was created, whereby potential bidders would have the opportunity to review materials necessary to assess the Debtors' businesses and operations.

18.     The Investment Offering Advisor, with the CRA and the Debtors, compiled a list of potential bidders. The Monitor was consulted in the development of this list and also requested the First Lien Lenders' Agent and Second Lien Lenders' Agent to provide names to be added to the list of interested parties. The Investment Offering Advisor, with the CRA and the Debtors, then contacted 91 interested parties by phone, arranging for interested parties to move forward in the Marketing Process.

19.     As a result of the efforts undertaken during Phase I, the Investment Offering Advisor received expressions of interest from 13 potential purchasers. After review by the Investment Offering Advisor and the CRA, in consultation with the Independent Directors, and the First Lien Lenders' Agent, eight interested parties were invited to move to *Phase II*

("**Phase II Parties**"). The Investment Offering Advisor also informed a spokesperson of the Second Lien Lenders as to how many parties were being invited to Phase II.

### Phase II

20.    The Phase II Parties, having each signed a non-disclosure agreement, toured the Debtors' facilities and began further due diligence. The Phase II Parties initially had until August 30, 2009, to submit revised proposals to purchase the Debtors' businesses and assets, but this deadline was extended with consent of the Monitor and the First Lien Lenders' Agent until September 11, 2009.

21.    Five of the Phase II Parties thereafter submitted revised bids. Two of the bids received were for either lower consideration or contained terms and conditions which made them clearly inferior to the other three; thus, only three bidders were selected to continue with their due diligence in Phase II. ("**Short Listed Parties**").

22.    The Short Listed Parties' bids were complex and subject to outstanding and further diligence. Accordingly, the Monitor extended the deadline by which the Short Listed Parties must submit revised bids; all bids were due by the extended deadline, October 2, 2009.

23.    The revised bids of the Short Listed Parties were timely submitted. The revised bids underwent evaluation by the Investment Offering Advisor and the CRA, including analysis of:

a.    the overall level of consideration offered by each bid;

b.    the composition of the consideration contained in each bid, including the amount of cash offered;

c.    the potential incremental realizable value, net of costs, from the assets excluded by each bid;

d.    the risk with respect to the financing of each of the bids; and

e.    the risks attendant to closing each of the bids.

24.     The Investment Offering Advisor and CRA completed an overview of the bids, which was filed in the CCAA Proceeding under seal, in order to protect the Marketing Process and, in the event the Proposed Sale (defined below) fails to close to protect the Debtors and the value of their businesses. However, the analysis of the Short Listed Parties was discussed with the Independent Directors, the steering committee of the First Lien Lenders and certain of the Second Lien Lenders (including the Second Lien Lenders' Agent) who executed non-disclosure agreements.

25.     Georgia-Pacific LLC, and certain of its affiliates and subsidiaries ("**Georgia-Pacific**"), was a Short Listed Party. As set forth herein, Georgia-Pacific's bid ("**Georgia-Pacific Bid**") was ultimately selected as providing the highest and best value to the Debtors' creditors and estates.

26.     On October 15, 2009, the Monitor and the CRA conducted a conference call with certain of the Second Lien Lenders to review the status of the Marketing Process and the bids of the Short Listed Parties.

27.     A steering committee of the First Lien Lenders reviewed the bids and a summary of the bids. By vote dated October 16, 2009, more than 66 2/3% of the First Lien Lenders voted in favor of selecting the Georgia-Pacific Bid for the Debtors' businesses and operations.

28.     On October 16, 2009, the Independent Directors likewise approved the Georgia-Pacific Bid, and authorized management to enter into an exclusivity agreement for the purpose of negotiating the terms and conditions of the sale to Georgia-Pacific ("**Exclusivity Period**").

29.     The Exclusivity Period, extended through January 8, 2010, by agreement, precluded the Debtors from seeking bids, responding to or negotiating with any other party with respect to the items included in Georgia-Pacific's Bid.

**Phase III**

30.     On January 8, 2010, the Debtors and Georgia-Pacific finalized the proposed transaction ("**Proposed Sale**"), which is comprised of a series of applicable consents and documents (collectively, the "**Agreement**").  A redacted copy of the Agreement (the redacted/excluded portions of which have been determined by Georgia-Pacific and the Debtors), that excludes certain confidential and competitive information and all related schedules, disclosure schedules, and exhibits, is attached to the Morrison Declaration in Support of Sale Motion as Exhibit B.  The parties contemplate closing the Proposed Sale on or before June 30, 2010 ("**Closing**"), though this date is subject to change.  At Closing, the Agreement requires certain of the Debtors and the First Lien Lenders' Agent, on behalf of the First Lien Lenders, and on behalf of the Second Lien Lenders' Agent, and the Second Lien Lenders, pursuant to the Intercreditor Agreement, to execute and provide certain documents, including without limitation a release agreement (the "**Release Agreement**") and a release and discharge agreement (the "**Release and Discharge Agreement**").

31.     A detailed discussion of the results of the Marketing Process is set forth in the Monitor's Reports to the CCAA Court, true and correct copies of which are attached to the Morrison Declaration in Support of Sale Motion as Exhibits C through K.

32.     Additionally, the First Lien Lenders' Agent, pursuant to an agreement dated January 8, 2010 ("**Consent Agreement**"), agreed to, among other things: (i) support the consummation of the transaction contemplated by the Agreement; (ii) effective upon Closing, release its liens, claims and other encumbrances against certain assets of the Debtors; and (iii) effective upon Closing, discharge and release certain obligations of the Obligors. A true and correct copy of the Consent Agreement is attached to the Morrison Declaration in Support of Sale Motion as Exhibit L.

33. In accordance with the Initial Order, through a series of extensions, the date to submit the Agreement and Proposed Sale to the CCAA Court for approval was set for February 1, 2010.

34. On January 15, 2010, the Initial Applicants gave notice of their Motion for Approval and Vesting Order ("**Canadian Sale Approval Motion**"), wherein the Debtors requested that the CCAA Court approve of the Agreement and the Proposed Sale, among other things. A true and correct copy of the Canadian Sale Approval Motion is attached to the Morrison Declaration in Support of Sale Motion as Exhibit M. Additionally, as discussed in more detail below, the First Lien Lenders' Agent moved the CCAA Court to add the US Entities and Grant Excluded GP ("**Excluded**") as additional applicants in the CCAA Proceeding (collectively, "**Additional Applicants**", and with Grant Holdings, the "**U.S. Applicants**").

### The Proposed Sale

35. The Proposed Sale proposes that a subsidiary of Georgia-Pacific, International Acquisition III, Ltd. ("**Canadian Purchaser**"), will purchase from Grant Forest, Alberta and Grant Sales (the "**Vendors**") certain Canadian assets ("**Purchased Assets**"), including a mill located in Englehart, Ontario (the "**Englehart Mill**"). The Purchased Assets exclude the a mill located in Timmins, Ontario ("**Timmins Mill**"), Footner Forest Products, Ltd. ("**Footner**"), the Non-Core Assets,[3] cash on closing, income tax refunds and certain other assets as described more fully in the Agreement.

36. Further, Grant Holdings, which holds interests in the Additional Applicants, has agreed to issue new partnership interests (the "**Purchasers' Partnership Interests**" and collectively with the Purchased Assets, the "**Acquired Interests**") in Grant Holdings to the subsidiaries of Georgia-Pacific ultimately purchasing the assets based in the United States,

---

[3] As that term is defined in the Agreement.

-10-

Georgia-Pacific LLC (the "**U.S. Purchaser**") and GP Palmetto Holding LLC (the "**Additional U.S. Purchaser**", and collectively with the U.S. Purchaser and Canadian Purchaser, the "**Purchasers**") and to admit the U.S. Purchaser and the Additional U.S. Purchaser as partners of Grant Holdings. Simultaneously, Grant Forest and Alberta will surrender their partnership interests in Grant Holdings (the "**Vendors' Partnership Interest**") and withdraw as partners of Grant Holdings (the "**Partnership Interests Transaction**"). The Partnership Interests Transaction has the effect of transferring the interests in and assets of the U.S. Applicants to the U.S. Purchaser and Additional U.S. Purchaser, including the mills located in Allendale, South Carolina, and Clarendon, South Carolina.

37. In furtherance of and to facilitate the Proposed Sale, the First Lien Lenders' Agent has agreed, provided that the Canadian Sale Approval Order (defined later) and the U.S. Order (defined later) are made, on its behalf and on behalf of the First Lien Lenders, the Second Lien Lenders' Agent and the Second Lien Lenders, to discharge all liens, claims and encumbrances the First Lien Lenders and Second Lien Lenders and their respective agents have pursuant to or in respect of the Credit Facilities, respectively against Grant Holdings, Southeast, Newco, Clarendon LP, Allendale LP, Excluded, and US Sales. For the purposes of determining the nature and priority of any claims against Grant Holdings, the net amounts paid by the U.S. Purchaser and Additional U.S. Purchaser to acquire the Purchasers' Partnership Interests, shall stand in the place and stead of the assets of Grant Holdings.

38. The aggregate consideration being paid by the Purchasers for the Purchased Assets and the Purchasers' Partnership Interests is $403 million, subject to *inter alia* adjustments for working capital relative to a target working capital and any losses calculated pursuant to a formula due to breaches of representations and warranties of the Debtors prior to closing the Proposed Sale.

39.     Additionally, pursuant to the Agreement, other than the liens and claims of the First Lien Lenders' Agent, the First Lien Lenders, the Second Lien Lenders' Agent, the Second Lien Lenders, and certain claims owing to affiliates of Grant Forest, the claims of the other creditors of the U.S. Applicants, other than claims owing by Grant Holdings,[4] will not be compromised, reduced or adversely affected simply as a result of the Proposed Sale.

**CCAA Proceeding:**

40.     On January 15, 2010, in an exercise of its enforcement remedies under the First Lien Debt and the Intercreditor Agreement, and in accordance with the Consent Agreement, the First Lien Lenders' Agent served a notice of motion to add the Additional Applicants as parties in the CCAA Proceeding. On March 31, 2010, the CCAA Court made such order as a result of which the foregoing entities are now applicants in the CCAA Proceeding (the "**Supplemental Initial Order**"). Pursuant to the Supplemental Initial Order, E&Y was appointed Monitor of the Additional Applicants.

41.     On March 31, 2010, the CCAA Court entered an order granting the Canadian Sale Approval Motion (the "**Canadian Sale Approval Order**"). Among other things, the Canadian Sale Approval Order: (i) approves the Agreement, the Release Agreement, and the Release and Discharge Agreement and the Debtors' entry into such agreements; (ii) authorizes and directs the Debtors to take the steps necessary to complete the transactions contemplated by the Agreement, the Release Agreement, and the Release and Discharge Agreement, including, without limitation, granting the necessary authority to approve the foregoing; (iii) approves of the entry into the Release and Discharge Agreement as provided for in the Intercreditor Agreement by (a) the First Lien Lenders' Agent (on behalf of itself

---

[4] Pursuant to the Canadian Order, all liens, claims and encumbrances against Grant Holdings' partnership interests, which are being purchased by Georgia-Pacific, were released, discharged and expunged. Upon information and belief, the Monitor and the Debtors believe that the only creditors of Grant Holdings were the First Lien Lenders' Agent, the First Lien Lenders, the Second Lien Lenders' Agent, the Second Lien Lenders, and certain affiliates of Grant Forest.

and the First Lien Lenders), (b) the First Lien Lenders' Agent (on behalf of the Second Lien Lenders' Agent and the Second Lien Lenders, pursuant to the Intercreditor Agreement) and (c) the Second Lien Lenders' Agent (on behalf of itself and the Second Lien Lenders); (iv) authorizes, empowers, and directs (a) the First Lien Lenders' Agent (on behalf of itself and the First Lien Lenders), (b) the First Lien Lenders' Agent (on behalf of the Second Lien Lenders' Agent and the Second Lien Lenders, pursuant to the Intercreditor Agreement), and (c) the Second Lien Lenders' Agent (on behalf of itself and the Second Lien Lenders) to take the steps necessary to complete the transactions contemplated by the Release and Discharge Agreement, including without limitation, directing the release and discharge of the First and Second Lien Lenders' Liability and all liens of the First Lien Lenders' Agent, the First Lien Lenders, the Second Lien Lenders' Agent or the Second Lien Lenders (or any one or more of them) (the "**Agents' Liens**") but provided that the Second Lien Lenders' Agent shall be relieved of its obligation to act if the First Lien Lenders' Agent takes the steps necessary to complete the transactions contemplated by the Release and Discharge Agreement on behalf of the Second Lien Lenders' Agent and the Second Lien Lenders pursuant to the Intercreditor Agreement; (v) releases the First Lien Lenders' Agent and the First Lien Lenders from any and all claims or liabilities as a result of the First Lien Lenders' Agent's execution and performance of the Release and Discharge Agreement pursuant to or in accordance with the Canadian Sale Approval Order; (vi) authorizes and directs the Monitor to carry out the actions set forth in the Agreement; (vii) vests in the Canadian Purchaser absolute, clear, and unencumbered title in and to the Purchased Assets free and clear of all Liens and claims, with such Liens and claims attaching to the proceeds generated from the sale of the Purchased Assets; (viii) vests in the U.S. Purchaser and the Additional U.S. Purchaser absolute, clear, and unencumbered title in and to the Purchasers' Partnership Interests in Grant Holdings free and clear of all Liens and claims; (ix) releases, discharges, extinguishes and expunges the

Agents' Liens and the First and Second Lien Lenders' Liability against the Purchasers' Partnership Interests, Grant Holdings and any asset, interest, right, or property, whether real, personal or mixed (collectively, the "**Collateral**") of any U.S. Applicant, other than the amounts paid by the U.S. Purchasers to acquire the Purchasers' Partnership Interests, net of applicable taxes and adjustments pursuant to the Agreement (the "**Net Partnership Interests Acquisition Proceeds**"), with any such liens and liability against the Collateral of Grant Holdings attaching to the Net Partnership Interests Acquisition Proceeds; (x) appoints and constitutes the Monitor as the trustee of the Net Partnership Interests Acquisition Proceeds (the "**Partnership Proceeds Trustee**"); (xi) authorizes, empowers, and directs the Monitor to initiate proceedings before this Court to obtain the U.S. Order; and (xii) grants such further and related relief as set forth in the Canadian Sale Approval Order.

42. The sale, issuance, and transfer of the Purchased Assets and Purchasers' Partnership Interests by the Debtors to the Purchasers and the consummation of the transactions described in the Agreement have been authorized and approved by the Debtors, the Monitor, the CCAA Court, the First Lien Lenders' Agent (on behalf of itself and the First Lien Lenders), and the First Lien Lenders' Agent (on behalf of the Second Lien Lenders' Agent and the Second Lien Lenders, pursuant to the Intercreditor Agreement).

43. As a condition to their purchase and acquisition of the Acquired Interests, the Purchasers require that the Acquired Interests be sold in accordance with the terms of the Canadian Sale Approval Order and, separately, pursuant to an order from this Court that provides that: (i) the Purchasers' Partnership Interests are being sold, issued, and transferred free and clear of the First and Second Lien Lenders' Liability and the First and Second Lien Lenders' Agents' Liens and (ii) the First and Second Lien Lenders' Liability and the First and Second Lenders' Agents' Liens be released and discharged, as against the Purchasers' Partnership Interests, the U.S. Applicants, the Collateral of each U.S. Applicant, and the U.S.

Equity Interests.[5]   Without the preceding, the Purchasers would not enter into and consummate the Proposed Sale, thus adversely affecting the Debtors' estates and the Debtors' ability to maximize the value of their interests.

44.    Neither E&Y nor the Debtors are affiliated with any of the Purchasers, and the Agreement and Proposed Sale were negotiated, proposed and entered into by the parties in accordance with the Initial Order without collusion, in good faith, from arm's length bargaining positions and for fair value.   Accordingly, the Purchasers are good faith purchasers under Section 363(m) of the Bankruptcy Code and, as such, entitled to the protections afforded thereby.

45.    The CCAA Court found that the Agreement and Proposed Sale are commercially reasonable and are in the best interests of the Debtors and their stakeholders.

**Chapter 15 Cases**

46.    On March 31, 2010, pursuant to the terms of the Canadian Sale Approval Order, the Monitor, on behalf of the Debtors, filed petitions for recognition under Chapter 15 of the Bankruptcy Code before this Court.

47.    As provided for and contemplated by the Canadian Sale Approval Order, the CCAA Court ordered that Grant Holdings, Southeast, Clarendon LP, Allendale LP, US Sales, Newco, and Excluded are authorized to enter into the Agreement and authorized to sell the Acquired Interests to the Purchasers and to otherwise fulfill all of their obligations under the Agreement, Release Agreement, and Release and Discharge Agreement.

**RELIEF REQUESTED**

48.    By this Motion, the Monitor seeks an order from this Court: (I) affirming and enforcing the Canadian Sale Approval Order; (II) separately authorizing and approving the

---

[5] "U.S. Equity Interests" is defined as the equity interest of each U.S. Applicant.

Vendors' sale and transfer of assets free and clear of certain liens, claims and encumbrances, including: (a) approving the Debtors' entry into the Agreement, the Release Agreement, and the Release and Discharge Agreement; (b) authorizing and directing the Debtors to take steps necessary to complete the Proposed Sale as contemplated by the Agreement, the Release Agreement, and the Release and Discharge Agreement; (c) approving the sale and issuance of the Purchasers' Partnership Interests; (d) authorizing and directing the First Lien Lenders' Agent, on behalf of itself, the First Lien Lenders, the Second Lien Lenders' Agent, and the Second Lien Lenders, pursuant to the Intercreditor Agreement, as applicable, to take steps necessary to complete the Proposed Sale as contemplated by the Agreement, the Consent Agreement, and the Release and Discharge Agreement; (e) releasing the First Lien Lenders' Agent and First Lien Lenders from liability or claims resulting from the First Lien Lenders' Agents' execution of the transactions contemplated herein; (f) authorizing and directing the First Lien Lenders' Agent to execute releases, on its behalf, and on behalf of the First Lien Lenders, the Second Lien Lenders' Agent, and the Second Lien Lenders, of the First and Second Lien Lenders' Liabilities and Agents' Liens; (g) approving the sale and issuance of the Purchasers' Partnership Interests free and clear of the First and Second Lien Lenders' Liabilities and the Agents' Liens; (h) releasing and discharging the First and Second Lien Lenders' Liability and the Agents' Liens as against the Purchasers' Partnership Interests, the U.S. Equity Interests, the U.S. Applicants, and the Collateral of each U.S. Applicant; (i) authorizing the Partnership Proceeds Trustee to hold the Net Partnership Interests Acquisition Proceeds in trust for the benefit of the creditors of Grant Holdings; (j) authorizing the attachment of the First and Second Lien Lenders' and Agents' Liens to the Net Partnership Interests Acquisition Proceeds and providing for the Liens to attach in the same priority as recognized against Grant Holdings and its Collateral; (k) authorizing the Partnership Proceeds Trustee to assume all indebtedness of creditors of Grant Holdings on a non-recourse

basis; (I) authorizing the Partnership Proceeds Trustee to distribute the Net Partnership Interests Acquisition Proceeds in accordance with orders by the CCAA Court; (III) setting this Motion down for a hearing to approve the Proposed Sale and enter the relief requested herein ("**Sale Hearing**"), as provided for in *Monitor's Motion for Order (I) Specifying Form and Manner of Service of Notice of Filing of Petitions and Other Pleadings Pursuant to Chapter 15 of the Bankruptcy Code, and (II) Scheduling a Hearing on Chapter 15 Petitions for Recognition and for Approval of the Sale of Certain Assets* ("**Notice Motion**") filed contemporaneously herewith; and (IV) such other related and further relief as is just under the circumstances.

**BASIS FOR RELIEF REQUESTED**

A.    The Court Should Recognize, Affirm, and Enforce the Canadian Sale Approval Order

49.    Section 1521 of the Bankruptcy Code sets forth various forms of relief that may be granted upon recognition of a foreign proceeding. Specifically, section 1521(b) of the Bankruptcy Code provides, in pertinent part, that "[u]pon recognition of a foreign proceeding . . . the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative." 11 U.S.C. 1521(b).

50.    Further, sections 1525 and 1527 of the Bankruptcy Code, when read in conjunction, direct this Court "to cooperate to the maximum extent possible" with the CCAA Court regarding "the coordination of the administration and supervision" of the Debtors' assets and affairs. 11 U.S.C. §§ 1525, 1527(3); *see also In re Metcalfe & Mansfield Alt. Invest.*, No 09-16709, 2010 Bankr. LEXIS 1 (Bankr. S.D.N.Y. Jan. 5, 2010) (generally recognizing, on the basis of the statutory provisions of Chapter 15 and the principles of comity, order entered in a CCAA proceeding). Indeed, a Bankruptcy Court is not required to

"make an independent determination about the propriety of individual acts of a foreign court. . . . The key determination required by [U.S. Bankruptcy Courts] is whether the procedures used in Canada meet our fundamental standards of fairness." *Id.* at *32.

51.     The CCAA Court approved and monitored the Marketing Process and the collective efforts to sell the Debtors' businesses and operations. After extensive marketing, consultation with the CRA, the Investment Offering Advisor, the Independent Directors, and the First Lien Lenders' Agent, the Debtors and Monitor have determined that the Georgia-Pacific Bid provides the highest and best return to the Debtors, their creditors, and their stakeholders. Indeed, the Canadian Sale Approval Order recognizes that the Proposed Sale, Agreement, Release Agreement, and Release and Discharge Agreements represent the highest and best return to the Debtors, their creditors, and their stakeholders. Moreover, the First Lien Lenders have approved the Proposed Sale on their behalf and on behalf of the Second Lien Lenders and Second Lien Lenders' Agent, pursuant to the authority granted in the Intercreditor Agreement.

52.     The Canadian Sale Approval Order authorizes the distribution of the Debtors' assets in that it approves the sale of the Purchased Assets and the issuance of the Purchaser's Partnership Interests. Moreover, the Canadian Sale Approval Order authorizes the applicable Debtors to release the Vendors' Partnership Interests in order to consummate the Partnership Interest Transaction. The First Lien Lenders' Agent is authorized to take steps necessary to release the First Lien Lenders' security interests and the Second Lien Lenders' security interests in the various assets that are the subject of the Proposed Sale.

53.     In order that the Proposed Sale takes effect, the Monitor now seeks recognition and affirmation of the Canadian Sale Approval Order, so that it is effective under the laws of the United States. Effective administration of the estate can only be achieved through recognition of the Canadian Sale Approval Order in the United States. Moreover, the

extensive nature of the Marketing Process, carried out by the Debtors with assistance from the Investment Offering Advisor and the CRA, overseen by the CCAA Court and the Monitor, and approved by the First Lien Lenders, ensures that a fair result is achieved by the Proposed Sale. Accordingly, this Court should recognize and give full effect and force under the laws of the United States the findings, authorities, and provisions set forth in the Canadian Sale Approval Order.

      B.      The Court Should Authorize and Approve the Issuance and Sale of the Purchaser's Partnership Interests Free and Clear of Certain Liens, Claims and Encumbrances Pursuant to Section 363 of the Bankruptcy Code

54.      The Partnership Interest Transaction meets the requirements of Section 363 of the Bankruptcy Code. Moreover, the First Lien Lenders' Agent, on behalf of itself, the First Lien Lenders, the Second Lien Lenders' Agent, and the Second Lien Lenders, has consented to the Partnership Interests being issued and sold free and clear of liens. Thus, the Court should approve the Partnership Interest Transaction, and authorize the Debtors to issue and sell the Purchaser's Partnership Interests free and clear of the First Lien Lenders' and Second Lien Lenders' Liability.

      1.      Standard of Review

55.      Pursuant to section 1520 of the Bankruptcy Code, "once a foreign proceeding is recognized as a foreign main proceeding, [section] 363 applies 'to any transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States.'" *In re Pro-fit Holdings Ltd.*, 391 B.R. 850, 866-67 (Bankr. C.D. Cal. 2008) (citing 11 U.S.C. § 1520(a)(2)); *see also In re Grand Prix Assoc., Inc.*, No. 09-16545, 2009 Bankr. LEXIS 1779 (Bankr. D. N.J. June 26, 2009) ("Section 1520(a)(2) applies section 363 to transfers of the debtor's interests in property that is within the territorial jurisdiction of the Unites States . . . .").

56.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

57.     Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); *In re Stroud Ford, Inc.*, 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

58. The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely: (1) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor-in-possession has obtained a fair and reasonable price; and (4) good faith. *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.*, 722 F.2d at 1071.

59. Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *Lionel*, 722 F.2d at 1063 (passim).

60. Finally, the trustee or debtor in possession may sell property free and clear of interests in the subject property if those entities with an interest in the property consent to the sale of the property free and clear of their interests. *See* 11 U.S.C. § 363(f)(2).

2. <u>The Partnership Interest Transaction Meets Section 363's Requirements</u>

61. After a thorough review of the Debtors' businesses and operations, and extensive marketing by the Monitor, CRA, and Debtors, pursuant to the Marketing Process, the Debtors, CRA, Monitor, Independent Directors, a super-majority of the First Lien Lenders, and the First Lien Lenders' Agent have determined that the Georgia-Pacific Bid, the Agreement, the Release Agreement, the Release and Discharge Agreement, and the Proposed Sale represent a reasonable business judgment of the Debtors and will result in the highest and best return to the Debtors, their creditors, and their Stakeholders.

62.     Indeed, at the Sale Hearing, the Debtors and the Monitor will establish that the Agreement, Release Agreement, Release and Discharge Agreement, and Proposed Sale represent the highest and best price for the Acquired Interests and provide the Debtors with the best opportunity to maximize the value of all of their assets.

63.     The Agreement, Release Agreement, Release and Discharge Agreement, Proposed Sale, and Partnership Interest Transaction were the result of the Marketing Process that included a structured, fair, wide and effective canvassing of the market as demonstrated by the following:

(a)     contact by the Investment Offering Advisor of the 91 interested parties comprising both financial and strategic parties located in North America, South America, Europe and Asia;

(b)     the execution of 32 non-disclosure agreements by interested parties who were then granted access to review the Data Room and the subsequent submission of 13 expressions of intent;

(c)     the expressions of interest of eight interested parties that were invited to participate in *Phase II* provided a value range which was market derived and tested, and as such, supported the conclusion that the consideration included in Georgia-Pacific's bid reflected fair value;

(d)     of the eight interested parties that were invited to *Phase II*, five submitted improved bids in respect of consideration and/or closing conditions at the close of *Phase II* and of the three interested parties that were invited to continue, each party again improved its bid in terms of consideration and/or closing conditions at the end of *Phase II*;

(e)     the selection of Georgia-Pacific to negotiate the Agreement was based on a thorough analysis of all of the financial and commercial terms presented in all of the bids, was recommended by the Monitor and the CRA and was approved by the First Lien Lenders steering committee, and the Independent Directors; and

(f)     the Second Lien Lenders were consulted, and their views and questions were taken into account in the final selection of Georgia-Pacific.

64.     In short, the Marketing Process worked as planned, with the result being the highest and best return to the Debtors' estates.

65.     Moreover, the Agreement, Release Agreement, Release and Discharge Agreement, and Proposed Sale were negotiated, proposed and entered into by the parties in

accordance with the Initial Order and Marketing Process, without collusion, in good faith, from arm's length bargaining positions and for fair value. In fact, neither E&Y nor the Debtors are affiliated with any of the Purchasers. Accordingly, the Purchasers are good faith purchasers under Section 363(m) of the Bankruptcy Code and, as such, entitled to the protections afforded thereby.

66.    The First Lien Lenders' Agent, on behalf of itself, the First Lien Lenders, the Second Lien Lenders' Agent, and the Second Lien Lenders, has consented to the Partnership Interest Transaction, and the issuance and sale of the Purchasers' Partnership Interests free and clear of their respective security interests. Accordingly, section 363(f)(2) is satisfied.

67.    In addition, the Proposed Sale provides that the liens of the First Lien Lenders and Second Lien Lenders and their respective agents will attach to the proceeds of the Partnership Interest Transaction, to the same extent and with the same validity and priority as such liens had attached to the collateral immediately preceding the Proposed Sale, which proceeds shall be held in trust by the Monitor pending distribution. Accordingly, the claims of the affected parties are protected against prejudice and inconvenience, and will be afforded just treatment. *See, e.g., Metcalfe,* 2010 Bankr. LEXIS at *29 (recognizing, pursuant to 11 U.S.C. § 1507, that protection of claims is a factor in fashioning relief under chapter 15).

## NOTICE

68.    The Monitor proposes to provide notice of this Motion to the Notice Parties, as that term is defined in the Notice Motion, pursuant to the manner specified therein. The Monitor submits that, under the circumstances, the foregoing provides due and adequate notice and that no further notice is necessary.

## WAIVER OF BANKRUPTCY RULE 6004

69.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.

70.     Although Bankruptcy Rule 6004(h) is silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay, commentators agree that the 14-day period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally,* 10 COLLIER ON BANKRUPTCY, ¶ 6004.09 (15th Ed. 1999).

71.     Pursuant to the Agreement, the Partnership Interest Transaction must close promptly. Thus, waiver of the applicable stay is appropriate in these circumstances.

## NO PRIOR REQUEST

72.     No prior request for the relief sought herein has been made to this or any other court.

## PROVISIONS THAT MAY IMPLICATE LOCAL RULE 6004-1(b)(iv)

73.     Pursuant to Local Rule 6004-1(b)(iv), the Monitor highlights the following provisions of this Motion relating to the Proposed Sale, including:

(a)     Releases. The First Lien Lenders' Agent is seeking a release from claims that may be asserted for complying with the Court's Order.

(b)     Closing and other deadlines. The Agreement proposes that the Proposed Sale will close on or before June 30, 2010.

(c)     Private Sale. The Agreement, Release Agreement, Release and Discharge Agreement, and Proposed Sale were negotiated after extensive marketing, in compliance with the Marketing Process approved by the CCAA Court. The CCAA Court also approved the Proposed Sale. Nonetheless, Debtors' acceptance of Georgia-Pacific's Bid could be considered a private sale.

(d)     Use of Proceeds. Pursuant to the Agreement, the proceeds from the Proposed Sale will be held in trust by the Monitor, pursuant to the

procedures set forth in the Canadian Sale Approval Order. The proceeds will be distributed in accordance with the terms of the Canadian Sale Approval Order and other orders entered in the CCAA Proceeding.

(e)    Relief from Bankruptcy Rule 6004(h). The Monitor seeks relief with respect to the Proposed Sale.

WHEREFORE, the Monitor respectfully requests that this Court, after notice and hearing, (i) grant this Motion and the relief requested herein; (ii) enter the proposed Order substantially in the form attached hereto as **Exhibit A**; and (iii) grant such other and further relief as the Court deems proper and just.

Dated: March 31, 2010
    Wilmington, Delaware

**ELLIOTT GREENLEAF**

Rafael X. Zahralddin-Aravena (DE Bar No. 4166)
Shelley A. Kinsella (DE Bar No. 4023)
Andrew G. Mirisis (DE Bar No. 5365)
1105 North Market Street, Suite 1700
Wilmington, Delaware 19801
Telephone: (302) 384-9400
Facsimile: (302) 384-9399
Email: rxza@elliottgreenleaf.com
Email: sak@elliottgreenleaf.com
Email: agm@elliottgreenleaf.com

-- and --

Jeffrey W. Kelley
Garrett A. Nail
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, NE
Suite 5200
Atlanta, GA 30308-2216
Telephone: (404) 885-3000
Facsimile: (404) 885-3900
Email: Jeffrey.Kelley@troutmansanders.com
Email: Garrett.Nail@troutmansanders.com

*Attorneys for Ernst & Young Inc., Monitor
and Foreign Representative of the Debtors*